EAAN SILCOX, as Personal
Representative of the Estate of
Aaron John Silcox,

      Plaintiff,

v.                                   Case No. 3:16-cv-1509-J-32MCR

MARK HUNTER, in his official
capacity as Columbia County
Sheriff,

      Defendant.

_____

# O R D E R

A pretrial detainee committed suicide in the Columbia County Detention Facility. Is the Sheriff liable under either § 1983 or in negligence?

Plaintiff Eaan Silcox, as Personal Representative of the estate of Aaron Silcox, seeks damages from the Sheriff of Columbia County after Aaron Silcox committed suicide as a pretrial detainee in the Columbia County Detention Facility (the "jail"). Currently pending before the Court are Defendant Sheriff Mark Hunter's Amended Motion for Summary Judgment, (Doc. 46), and Daubert Motion, (Doc. 39), and Plaintiff's Motion for Partial Summary Judgment, (Doc. 41). Plaintiff responded to both of Hunter's motions, (Docs. 47;

49), and Hunter responded to Plaintiff's motion, (Doc. 48). On June 18, 2018, the Court held a hearing on the motions, the record of which is incorporated herein. (Doc. 53).

# I. BACKGROUND

## A. Silcox's Arrest, Medical Evaluations, and Detention

On June 13, 2015, Jessica Hosford called the Columbia County Dispatch to alert them that Aaron Silcox, the father of two of her children, had overdosed on an unknown substance. (Doc. 40-1 at 1–2). Hosford provided Silcox's number to deputies, and they obtained a GPS location for his phone. (Doc. 40-1 at 1–2). When deputies arrived, they found a man who identified himself as John Price, who told the deputies where to find Silcox. (Doc. 40-1 at 1–2). Upon arriving at this new location, the deputies realized that the man they had just spoken with was Silcox. (Doc. 40-1 at 1–2).

When the deputies returned to the previous location, Silcox was not there, so they called for a K-9 dog to help search the nearby woods. (Doc. 40-1 at 1–2). Once found, Silcox did not comply with the deputies' commands and was bitten by the police dog. (Doc. 40-1 at 1–2). Silcox told a deputy that he wanted to kill himself and had taken a "handful" of his prescription medication and aspirin. (Doc. 40-1 at 1–2). Emergency Medical Services transported Silcox to Shands Lake Shore Hospital where a physician determined Silcox should be taken to a facility for an involuntary mental health examination under Florida's Baker

Act, Florida Statute § 394.463. (Doc. 40-1 at 1–3). Silcox's toxicology screenings did not return abnormal levels for the pills he claimed to have ingested, but did test positive for the presence of amphetamines, methamphetamines, and THC. (Doc. 40-2 at 4). Emergency room personnel treated Silcox for dog bite injuries he sustained during his arrest, and self-inflicted cuts to his forearm, which Silcox told the emergency room nurse he did with a pocket knife in an attempt to kill himself. (Doc. 40-2 at 1).

Silcox remained in the hospital overnight, and while he was there Hosford called the jail to make sure they knew Silcox was suicidal. (Doc. 49-13 at 99). Although Silcox was still in the hospital, the jail representative told Hosford that Silcox was at the jail and that they would take care of him. (Doc. 49-13 at 99–100).

The next day, June 14, 2015, Silcox was involuntarily transferred to Meridian Behavioral Healthcare in Lake City for psychiatric evaluation. (Doc. 40-2 at 2). Dr. Robert Bachus[1] evaluated Silcox at Meridian. (Doc. 40-4 at 1). Bachus is a licensed psychiatrist who had approximately twenty years of experience. (Doc. 49-17 at 5–7). Bachus determined that Silcox "is a chronic drug abuser who experiences bouts of depression associated with consequences

---

[1] Throughout the pleadings, Bachus is referred to as Dr. Richard Bachus, and his deposition is even labelled as such. However, Bachus's first name is Robert. (Doc. 49-17 at 4).

of his addiction. He is psychiatrically stable enough to be placed in jail for drug associated charges. No psych meds indicated." (Doc. 49-17 at 27); (see Doc. 40-4 at 1). Although Bachus believed that Silcox was a suicide risk, he did not indicate that opinion anywhere in his records nor did he tell anyone from Hunter's office. (Doc. 49-17 at 44).

After being discharged from Meridian, deputies brought Silcox to the jail. (Doc. 40-5 at 1). On his initial medical questionnaire, Silcox stated that he had never attempted suicide nor did he feel like attempting suicide at that time. (Doc. 40-5 at 1). During previous jail stays, Silcox had specified on his initial medical questionnaire that he had previously attempted or contemplated suicide. (Docs. 49-2; 49-3). The following morning, June 16, 2015, jail nurse Rex Nichola denoted on Silcox's medical screening form that he had mental health problems and had attempted suicide two days prior, but that he was not currently contemplating suicide and did not have feelings of hopelessness. (Doc. 40-5 at 4). Based on his assessment, Nichola recommended Silcox be placed in the jail's general population.[2] (Doc. 40-5 at 4).

_____

[2] The Florida Department of Law Enforcement ("FDLE") investigative report states: "The Classification information provided indicated that Silcox was a High Observation, Special Segregation inmate." (Doc. 40-7 at 1). However, Major Joe Lucas, who was the jail administrator in June, 2015, stated in his affidavit that the classification listed in the FDLE investigation was incorrect because the information sheet given to FDLE listed the classification Silcox had at the time of his death, which had become "High Observation" upon his transfer to F-max. (Doc. 40-13 at 3). Nonetheless, whether Silcox was booked

Two days later, Silcox was caught fighting another inmate, so under jail policy, both inmates were moved to the F-max dorm for administrative confinement. (Doc. 46 at 6). The F-max dorm has eighteen cells and houses inmates needing protective custody, administrative confinement, or disciplinary confinement. (Doc. 49-15 at 30, 36). In the F-max dorm, the officer on duty is located in an officer station that has a computer for the electronic logs and closed circuit monitors for watching the movements of the inmates in their cells. (Doc. 49-15 at 29, 53).

Detention Officer Dillon Moore was responsible for the F-max dorm on June 18, 2015. (Doc. 49-15 at 13). At approximately 7:00 p.m. that evening, Silcox arrived at the F-max dorm. (Doc. 40-8 at 1). Moore watched Silcox go into cell number two, which was unoccupied and had a bunkbed, and throw his sheet, along with other belongings, onto the top bunk. (Doc. 49-15 at 35–36, 38–39). Moore had never met Silcox and did not know anything about his prior suicide attempts or mental health issues. (Doc. 49-15 at 39–40). When Silcox first arrived, Moore knew he was upset because "[h]e was just in a fight. And I was watching and he sat down, lay on the floor, sit back up and, I mean, he was just everywhere." (Doc. 49-15 at 53).

_____

as a high observation inmate is immaterial to the Court's decision.

Approximately thirty minutes later, a civilian came into the F-max dorm to pass out canteen.[3] (Doc. 40-8 at 1). During canteen distribution, Moore left the officer station and went into the dorm hallway to "provide order" while the civilian and a trustee[4] distributed canteen to the F-max inmates. (Doc. 49-15 at 25–27). During this time, Moore was about thirty feet away with his back to Silcox's cell. (Doc. 49-15 at 20, 37). Because Moore left the officer station, Detention Officer Tiffany Riley, who was working in the adjacent female dorm, occupied the F-max officer station to ensure Moore's safety. (Docs. 49-15 at 32–33; 49-16 at 19).

Moore and Riley's recollections of the events differ. Moore testified that after canteen distribution in the F-max, he accompanied the civilian to another dorm for canteen distribution, then used the restroom, and finally returned to the officer station. (Doc. 49-15 at 44). His log states that the civilian left the F-max at 7:41 p.m. (Doc. 40-8 at 2). Moore recalled working on paperwork in the F-max officer station when Sergeant Melvin Sheppard, a jail supervisor, arrived. (Doc. 49-15 at 51). When Sheppard arrived, he and Moore both noticed on the monitor that Silcox was not moving. (Docs. 49-15 at 54–56; 40-6 at 3).

---

[3] Canteen consists of items such as snacks, clothes, and toiletries that inmates order ahead of time and are then distributed to them by a civilian. (Doc. 49-16 at 106–07).

[4] A trustee is an inmate who, based on their criminal history and jail record, is selected to assist jail staff in the performance of certain duties.

Moore went to Silcox's cell and found him hanging by his bedsheet, which was tied to the top bunk. (Doc. 49-15 at 105–06).

However, Riley claims that immediately following the F-max canteen distribution, she accompanied the civilian back to the female dorm for canteen distribution. (Doc. 49-16 at 16). According to Riley's deposition testimony,[5] her log states that the civilian entered the female dorm to distribute canteen at 7:47 p.m. (Doc. 49-16 at 66). Riley stated that while she was distributing canteen with the civilian in the female dorm, Moore yelled to her that one of the F-max inmates had hung himself. (Doc. 49-16 at 11–13). At that time, she stopped canteen and went to assist Moore, which she noted in her log as being around 8:20 p.m.[6] (Doc. 49-16 at 66, 109–11).

A subsequent investigation by FDLE investigators revealed that Silcox initiated his suicide at 7:25 p.m., and he adjusted the bedsheet twice before ceasing all movement on his third attempt at 7:33 p.m. (Doc. 40-7 at 2). No officer entered the room until 8:11 p.m. (Doc. 40-7 at 2). Officers performed CPR

---

[5] Riley's actual log was never filed. However, during her deposition, the parties went through the log with her. (Doc. 49-16 at 64–67).

[6] Riley stated in her deposition that the 8:20 p.m. time was an estimate. She made the log entry at 9:29 p.m. indicating that she left for the F-max dorm around 8:20 p.m. (Doc. 49-16 at 109–11). She went to assist Moore as soon as he yelled to her and made the log entry after she returned to the female dorm.

on Silcox for fourteen minutes until emergency medical services arrived. (Doc. 40-7 at 2). At 8:26 p.m., Silcox was pronounced dead. (Doc. 40-7 at 2).

**B. Columbia County Jail Policies and Training**

The F-max had a Post Order, (Doc. 40-16), which was in a binder in the officer station, and each officer working that post was expected to know and abide by its contents. (Doc. 49-15 at 98–99). The F-max Post Order required formal counts of the inmates at 6:00 a.m., 6:00 p.m., and 11:00 p.m., and informal counts every hour between midnight and 4:00 a.m. (Doc. 40-16 at 3). Other dorms had similar orders pertaining specifically to those dorms. Additionally, the jail had General Orders that covered other topics, such as Special Management Inmates and Mental Health Services. (Doc. 40-13 at 5–10).

General Order 19.10, titled "Special Management Inmates," provides instructions for handling inmates on suicide watch and states: "Direct observation shall be required for any inmate restrained to protect themselves [sic] or others from harm or when ordered by the health authority or designee." (Doc. 40-13 at 6). The Order further states: "Any inmate who threatens verbally or by note, or attempts suicide is placed on suicide prevention. A mental health or medical physician may recommend that an inmate be placed on suicide prevention after an interview with said inmate." (Doc. 40-13 at 6). An inmate on suicide watch is not allowed to have bedding in his cell. (Doc. 40-13 at 7). Additionally, General Order 19.17, titled "Mental Health Services," provides

8

"guidelines for the provision of necessary and adequate psychiatric care and services at the Columbia County Detention Facility." (Doc. 40-13 at 9). The policy requires officers to notify medical personnel if they observe certain listed behaviors. (Doc. 40-13 at 9). In addition, officers are to "ensure that all items that could be used by the inmate to inflict self-harm are taken away from the inmate, the cell area and the holding area." (Doc. 40-13 at 9).

Hunter also states that he had an unwritten policy of having arrestees who exhibited signs of suicidal tendencies or ideation cleared by psychiatric professionals at Meridian prior to being transported to the jail. (Doc. 46 at 15). Riley stated that at least once a year officers had refresher training on dealing with mental illness. (Doc. 49-16 at 90–91). Moore stated that he received training on how to supervise high risk inmates, but not on identifying suicidal inmates or suicide attempts. (Doc. 49-15 at 10–11).

**C. Procedural History**

On December 6, 2016, Plaintiff filed his original complaint, (Doc. 1), and on July 5, 2017, filed the Amended Complaint, (Doc. 23). The Amended Complaint alleges one count against Hunter and Moore for violating 42 U.S.C. § 1983 and one count against Hunter alleging wrongful death under Florida law. (Doc. 23). Moore settled with Plaintiff at mediation, (Doc. 29), and was subsequently dismissed from the suit with prejudice, (Doc. 32). On January 8, 2018, Hunter filed his amended answer and affirmative defenses. (Doc. 35). On

January 12, 2018, Hunter filed a <u>Daubert</u> motion to exclude Plaintiff's expert Jeff Eiser, (Doc. 39), and a motion for summary judgment, (Doc. 40). On that same date, Plaintiff filed a motion for partial summary judgment, seeking to exclude several of Hunter's affirmative defenses. (Doc. 41). On January 16, 2018, Hunter, filed his Amended Motion for Summary Judgment. (Doc. 46).

## II. ANALYSIS

### A. Plaintiff's § 1983 claim

"Every person who, under color of [law] . . . , subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983 (2012). Thus, a plaintiff asserting a claim under § 1983 must demonstrate that (1) a person, (2) acting under the color of law, (3) violated his constitutional rights. <u>Id.</u> There is no dispute that the Sheriff and his employees were acting under the color of law, thus, only the first and third elements are at issue.

A sheriff sued in his official capacity is effectively an action against the governmental entity the sheriff represents, in this case Columbia County. <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.</u>, 402 F.3d 1092, 1115 (11th Cir. 2005). A municipality, such as Columbia County, is considered a person under § 1983, but its liability is limited to situations where a municipal policy caused the deprivation of rights. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658,

691 (1978) (holding that a municipality cannot be held vicariously liable under § 1983); see City of Canton v. Harris, 489 U.S. 378, 385 (1989). A municipal policy can be in the form of: (1) a written policy; (2) a custom, which is "a practice so settled and permanent that it takes on the force of the law[;]" (3) a decision by someone with final decision making authority; or (4) a policy of inadequate training or supervision, all of which must cause the alleged deprivation of constitutional rights. McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004).

Plaintiff alleges that Hunter had a policy of failing to protect pretrial detainees from self-harm, (Doc. 23 ¶ 39); Hunter did not create, implement, and enforce policies to prevent suicides, (Doc. 23 ¶ 40); and Hunter did not adequately train jail staff to identify and monitor suicidal inmates or to recognize and prevent suicide attempts, (Doc. 23 ¶ 40).

1. Hunter's policies for handling high risk detainees.

Plaintiff alleges that Hunter had a policy of failing to protect detainees. (Doc. 23 ¶ 39). In support, Plaintiff identifies a prior suicide in the jail and argues that for both suicides, Hunter found that no one violated any prison policy—which accentuates the need for better policies. (Doc. 49 at 7). Plaintiff's claim fails.

To establish Hunter's liability based on a municipal policy, Plaintiff must show that he suffered a constitutional deprivation as a result of Hunter's policy, or a "practice or custom that is so pervasive, as to be the functional equivalent

of a policy . . . ." <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1335 (11th Cir. 2013) (quotation marks omitted) (quoting <u>Hale v. Tallapoosa Cty.</u>, 50 F.3d 1579, 1582 (11th Cir. 1995)). For a stated policy to be unconstitutional, it must result in deliberate indifference to constitutional violations. <u>Id.</u> Thus, Plaintiff must establish that Hunter's policies were facially unconstitutional or that despite having a facially valid policy, it was custom to ignore it. <u>See</u> <u>McDowell</u>, 392 F.3d at 1290.

Here, Plaintiff fails to show that Hunter's policies or customs were unconstitutional. Hunter had policies in place to protect detainees who were at risk of suicide. General Order 19.10 provides instructions to officers for handling "special management inmates," including those with suicidal tendencies or ideations. (Doc. 40-13 at 5). General Order 19.17 instructs officers on how to handle inmates with mental health issues. (Doc. 40-13 at 9–10). Additionally, Hunter had an informal policy of having arrestees like Silcox evaluated by psychiatric professionals before being taken to the jail—which is exactly what happened here. (Doc. 40-13 at 2). These policies obviate Plaintiff's arguments that Hunter had a policy of failing to protect pretrial detainees from self-harm, (Doc. 23 ¶ 39), and that Hunter did not create, implement, and enforce policies to prevent suicides, (Doc. 23 ¶ 40).

Plaintiff has also not shown how these policies could have caused Silcox's death. <u>See</u> <u>Harris</u>, 489 U.S. at 385 (explaining that there must be a direct causal

link between the municipal policy and the alleged constitutional deprivation). Hunter's policies for handling suicidal detainees were never triggered for Silcox because the medical professionals who evaluated him never expressly classified him as high risk. (Docs. 46 at 21; 40-4 at 1; 40-5 at 3–4). Dr. Bachus wrote that Silcox was stable enough for jail, (Doc. 40-4 at 1), and Nurse Nichola recommended that Silcox be placed in general population, (Doc. 40-5 at 3–4). Just because Hunter's policies did not prevent Silcox's suicide does not mean that they caused it. See Cook, 402 F.3d at 1116 (stating there must be a causal link between the policy and the alleged deprivation of rights); see also Harris, 489 U.S. at 386 (explaining that an unconstitutional or negligent application of an otherwise valid policy, without more, is insufficient to hold a municipality liable).

This case might have been different had Silcox not been seen at Meridian. Silcox was arrested because Hosford called Columbia County dispatch to alert them to Silcox's potential suicide attempt. (Doc. 40-1 at 1–2). And after he had been taken into custody, Hosford called the jail to remind them that Silcox needed to be closely watched because she believed he was suicidal. (Doc. 49-13 at 99). However, between Hosford's warnings and Silcox's placement in the jail, Silcox was evaluated by several medical professionals, none of whom declared him a suicide risk. (Docs. 40-4 at 1, 40-5 at 2–5). Hunter relied on the opinions of medical professionals that Silcox was no longer "imminently a danger to

himself or others[,]" (Doc. 46 at 21 (quotations omitted) (quoting Bachus's deposition at 29)), and, thus, placed Silcox in general population as opposed to suicide watch.

Hunter's reliance on medical opinions—even if those opinions were not fully understood—does not constitute deliberate indifference to Silcox's constitutional rights. See Keith v. DeKalb Cty., 749 F.3d 1034, 1050 (11th Cir. 2014) ("A sheriff cannot be held liable for failing to segregate mental health inmates whom trained medical personnel have concluded do not present a risk of harm to themselves or others."). Plaintiff argues that Bachus never said that Silcox was no longer a suicide risk, and in fact believed he was a suicide risk. (Doc. 49 at 8–10). However, Bachus never said this to any of Hunter's employees, (Doc. 49-17 at 44), and such assessment is not clear from Bachus's discharge note, (Doc. 40-4 at 1). Moreover, Hunter reasonably believed that Bachus would not have discharged Silcox from Meridian if he posed a risk to himself, (Doc. 46 at 21); and even assuming, arguendo, that such belief was negligent, it is nonetheless insufficient to establish deliberate indifference. See Harris, 489 U.S. at 388 n.7, 388–91 (explaining that the standard for deliberate indifference is not based on the negligence of an employee but the training program as a whole in relation to the duties of the individual officers); Keith, 749 F.3d at 1053 ("[T]he deliberate indifference standard requires a showing of more than gross negligence.").

To be liable, Hunter must have had "knowledge of 'a <u>strong likelihood</u> rather than a mere possibility that the self-infliction of harm [would] occur.'" <u>Cook</u>, 402 F.3d at 1116 (quoting <u>Cagle v. Sutherland</u>, 334 F.3d 980, 986 (11th Cir. 2003)). But, in the three days leading up to his death, Silcox displayed no warning signs that he was contemplating suicide. In fact, Silcox affirmed on his booking medical questionnaire that he was not contemplating suicide, (Doc. 40-5 at 1), whereas on previous visits to the jail he had informed jail staff that he had attempted suicide or felt like attempting suicide at that time, (Doc. 49-2 at 1). Moreover, Hunter had information indicating that some of Silcox's prior suicide attempts may not have been genuine. (Docs. 40-2 at 4; 49-17 at 50–51). Silcox told his arresting officers "that he took a handful of his prescription medication, Seroquil, [sic] and several aspirin[,]" (Doc. 40-1 at 2), and the emergency room nurse and physician that "he took a bottle of [aspirin] and about 6 Somas[,]" (Doc. 40-2 at 1–2). However, his toxicology tests did not detect abnormal aspirin levels, and his drug screen only yielded positive results for amphetamines, methamphetamines, and THC. (Doc. 40-2 at 4). Additionally, Bachus opined that at least one of Silcox's prior "suicide attempts" was likely just a ploy to avoid going to jail. (Doc. 49-17 at 50–51). On these facts, and as a matter of law, Hunter was not deliberately indifferent to the risk that Silcox would commit suicide. <u>See</u> <u>Salter ex rel Salter v. Mitchell</u>, 711 F. App'x 530, 541 (11th Cir. 2017) (finding that officer's general awareness of prior suicide was

insufficient where inmate was continuously monitored and had not displayed any behavioral issues in the three days leading up to the suicide).

Plaintiff's contention that Hunter customarily ignored the written policies also fails. (Doc. 49 at 14). To demonstrate deliberate indifference by having a custom of not following facially constitutional polices, Plaintiff must "show that the defendant had actual or constructive knowledge of a flagrant persistent pattern of violations." <u>Goodman</u>, 718 F.3d at 1335 (quotation marks omitted) (quoting <u>Goebert v. Lee Cty.</u>, 510 F.3d 1312, 1332 (11th Cir. 2007)). The custom must be "so settled and permanent as to have the force of law" and "ultimately result[] in deliberate indifference to a substantial risk of serious harm . . . ." <u>Id.</u> at 1335–36. In <u>Goodman</u>, the two officers failed to enter cells and deactivated emergency call buttons in violation of the official policy. <u>Id.</u> at 1335. Although the officers testified that despite the written policy to the contrary, it was "common practice at the Jail to deactivate emergency call buttons and to remain outside the cells in the admin section when doing head counts[,]" the Eleventh Circuit determined that this was insufficient to meet the "extremely rigorous standard." <u>Id.</u>

Here, Plaintiff has not established a genuine dispute of material fact that Hunter "had established customs and policies that resulted in deliberate indifference to constitutional violations." <u>Id.</u> (quotations omitted) (quoting <u>West v. Tillman</u>, 496 F.3d 1321, 1329 (11th Cir. 2007)). Plaintiff argues that if

Hunter's polices were followed, Silcox would have been placed on suicide watch and would not have had the opportunity to hang himself; but Plaintiff has not shown the existence of a "flagrant persistent pattern of violations[,]" let alone that Hunter had actual or constructive knowledge of it. See id. at 1335. Although there one prior suicide at the jail, the circumstances of that suicide are materially different from Silcox's suicide and do not establish a persistent pattern. See id. Plaintiff has not met the "extremely rigorous standard" of showing that the custom of not following the written policies is "so settled and permanent as to have the force of law . . . ." Id. at 1335–36.

2. Imposing liability for failing to properly train employees.

Another way of establishing municipal liability is to show a policy of inadequate training or supervision. See id. "[T]he inadequacy of [law enforcement] training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom [law enforcement] come into contact." Id. at 388. To demonstrate deliberate indifference, the plaintiff "must present some evidence that the municipality knew of a need to train . . . in a particular area and the municipality made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). A municipality is put on notice of a need to train in two ways: (1) it is aware of a pattern of constitutional violations and nonetheless fails to provide adequate training; or (2) where the

likelihood of a constitutional violation is so great that the need for training is obvious. <u>Lewis</u>, 561 F.3d at 1293; <u>see also</u> <u>Harris</u>, 489 U.S. at 390.

Where a municipality trains its employees, liability only attaches if such training is truly inadequate. <u>See</u> <u>Harris</u>, 489 U.S. at 390. The Supreme Court explained that a municipality is not liable every time one of its employees causes injury:

> [T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

<u>Id.</u> at 390–91.

Similarly, where a constitutional policy is in place, an employee's failure to follow the policy, or his negligent implementation of the policy, is insufficient to demonstrate deliberate indifference. <u>See</u> <u>Harris</u>, 489 U.S. at 390; <u>Lewis v. City of W. Palm Beach</u>, 561 F.3d 1288, 1293 (11th Cir. 2009). In <u>Lewis</u>, an arrestee was killed when officers improperly applied a hobble restraint. 561

F.3d at 1292–93. The plaintiff argued that the city failed to train its officers on the proper use of hobble restraints. Id. However, in concluding that the city was not liable because it provided training on the use of force and how to properly apply the hobble restraint, the Eleventh Circuit stated that "[i]t is . . . irrelevant what training each specific officer present at the scene was given or retained." Id. at 1293.

The municipality's inadequate training must also cause the deliberate indifference to the victim's rights. Harris, 489 U.S. at 391. Courts must scrutinize the link between the failure to adequately train and the injury alleged. Id. at 391–92. Thus, Hunter's alleged deliberate indifference to train—despite notice that such training was required—must have caused the jail officials' deliberate indifference to the risk of Silcox's suicide. See Jackson v. West, 787 F.3d 1345, 1353 (11th Cir. 2015); Lewis, 561 F.3d at 1293.

Plaintiff argues that a prior jail suicide in 2014 is evidence that Hunter was on notice of the need to train. (Doc. 49 at 8). Plaintiff also asserts that Hunter should have trained his employees to identify and prevent suicides. (Doc. 49 at 14–15).

Plaintiff has not demonstrated that Hunter was deliberately indifferent to the need for further training to prevent suicides. See Harris, 489 U.S. at 390; Lewis, 561 F.3d at 1293. Hunter had policies for dealing with suicidal inmates, (Doc. 40-13 at 5–10), and trained employees on handling inmates with mental

health issues, (Docs. 49-15 at 10–11; 49-16 at 90–91). Even assuming, <u>arguendo</u>, that one of Hunter's employees violated Silcox's constitutional rights, a municipality is not liable every time an employee's conduct results in a deprivation of an individual's constitutional rights. <u>Harris</u>, 489 U.S. at 391–92 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."). Plaintiff has not shown how any training inadequacies caused the deprivation of rights. <u>See</u> <u>Harris</u>, 489 U.S. at 391–92.

Although the Court disagrees with Hunter's statement that "the Sheriff has no obligation to train his staff to identify inmates who are suicidal," (Doc. 46 at 17), Plaintiff has not demonstrated a causal connection between the failure to train and Silcox's death. <u>See</u> <u>Harris</u>, 489 U.S. at 390. The Due Process Clause of the Fourteenth Amendment provides pretrial detainees with the right to be protected from harm, including suicide. <u>Cook</u>, 402 F.3d at 1115. Thus, Hunter has a constitutional duty to prevent foreseeable suicides. However, the record is devoid of evidence showing that during his time at the jail, Silcox displayed any indicators of suicide that Moore, Riley, or any jail staff member, had they been better trained, would have noticed. <u>See</u> <u>id.</u> Absent such a causal link, a plaintiff's "failure to train" claim fails as a matter of law. <u>Id.</u> (stating that

a plaintiff must prove that the deficiency in training actually caused the officer's deliberate indifference to his or her constitutional rights).[7]

Finally, Plaintiff asserts that Riley and Moore should have seen Silcox's suicide as it was happening and intervened, but that both of them failed to watch the video monitor that would have alerted them to what was happening. (Doc. 49 at 5-6). However, Plaintiff has not and cannot demonstrate that the failures of Moore, Riley, or both, even if negligent, were the result of Hunter's deliberate indifference to training. As the Supreme Court stated: "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [sheriff] liable." Harris, 489 U.S. at 390–91. Even if it was negligent to not periodically check the monitors during canteen distribution, Plaintiff has presented no evidence that this was because Hunter did not adequately train Riley or Moore.

Because no reasonable jury could find that Hunter violated Silcox's constitutional rights, summary judgment as to Count I is due to be granted in Hunter's favor.

---

[7] Interestingly, Plaintiff does not cite his expert's report in his response to Hunter's motion for summary judgment. Thus, the Court does not need to consider it in deciding the motion. Fed. R. Civ. P. 56(c)(3). Nonetheless, the expert's report does not create a genuine dispute of material fact because it also fails to demonstrate a causal link.

## B. Plaintiff's wrongful death claim

"It is long established that, under Florida law, corrections officers owe individuals within their custody a duty to use reasonable care for their safety." Cook, 402 F.3d at 1119. Florida has a limited waiver of sovereign immunity for governmental actors where a private person would be liable for the action. § 768.28, Fla. Stat. (2017). However, this waiver only applies to operational acts; discretionary functions are still immune. Cook, 402 F.3d at 1117.

> A discretionary function, under Florida law, is one in which "the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." "An 'operational' function, on the other hand, is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented."

Id. at 1117–18 (citations omitted) (quoting Henderson v. Bowden, 737 So. 2d 532, 538 (Fla. 1999)). In Cook, the Eleventh Circuit found that training curriculum and methods are clearly discretionary functions immune from tort. Id. at 1118. Additionally, "the 'classification and placement of inmates within the prison system constitutes a discretionary planning level function [and thus] sovereign immunity applies.' On the other hand, the failure to classify an inmate pursuant to an established classification policy is an operational function to which sovereign immunity does not attach." McCreary v. Brevard Cty., Fla., No. 6:09-CV-1394-ORL-19DA, 2010 WL 2509617, at *10 (M.D. Fla.

June 18, 2010) (citing <u>Davis v. Dep't of Corr.</u>, 460 So. 2d 452, 453 (Fla. 1st DCA 1984)).

Plaintiff alleges ten separate duties that Hunter, through his officers, agents, or employees, owed to Silcox, but breached. (Doc. 23 ¶¶ 48(a)-(j)). However, several of these alleged duties are discretionary functions, making Hunter immune from suit if they were in fact breached. <u>See</u> <u>Cook</u>, 402 F.3d at 1117. In particular, the duties to "identify pretrial detainees that are at risk of self-harm" and "implement adequate policies and procedures for the prevention of inmate suicide" are discretionary functions because they concern the development of jail policies. <u>See</u> <u>id.</u>; <u>McCreary</u>, 2010 WL 2509617, at *10. However, the remaining allegations attack how Hunter's policies were executed and are not barred by sovereign immunity. <u>See</u> <u>Cook</u>, 402 F.3d at 1119 n.13.

Without the barrier of sovereign immunity, Plaintiff may prevail upon a showing that correctional officers breached a duty that caused Silcox's death. <u>See</u> <u>id.</u> at 1119. Suicide is an independent intervening cause that may break the causal connection between an officer's alleged negligent conduct and an inmate's death. <u>Id.</u> at 1120. "However, causation is <u>not</u> defeated, and the officer is not relieved of liability, if the intervening cause was foreseeable or reasonably might have been foreseen by the wrongdoer.'" <u>Id.</u> (quoting <u>Schmelz v. Sheriff of Monroe Cty.</u>, 624 So. 2d 298, 298 (Fla. 3d DCA 1993)). "[U]nder Florida law, the evidentiary threshold for sending this claim to the jury is low. '<u>Only a total</u>

absence of evidence to support an inference that the intervening cause was foreseeable justifies the court in removing the question from the trier of fact.'" Id. (quoting Overby v. Wille, 411 So. 2d 1331, 1332 (Fla. 4th DCA 1982)).

Here, whether Hunter's knowledge of Silcox's prior suicide attempts, despite several medical professionals stating that he was not high risk, is a question of foreseeability that must be determined by the jury.[8] See id.; see also Timson v. Juvenile & Jail Facility Mgmt. Servs., Inc., 355 F. App'x 283, 285 (11th Cir. 2009) (compiling cases and explaining scenarios where there was a complete lack of evidence supporting that the suicide was foreseeable). Moreover, whether the acts of Moore and Riley were negligent is an issue of fact for the jury to determine. Therefore, Hunter's motion for summary judgment as to the wrongful death claim (Count II) is due to be denied.

### C. Motion to Exclude Plaintiff's Expert

Hunter seeks to exclude Plaintiff's expert, Eiser, on the grounds that his opinions are unreliable, rely on insufficient methodology, will not help the trier of fact, and exceed his expertise. (Doc. 39 at 1). In his report, Eiser offers three opinions: (1) that Hunter's failure to take reasonable steps to protect Silcox violated the jail's procedures and corrections industry standards and practices; (2) Hunter's failure to implement adequate policies and procedures for

---

[8] This ruling does not conflict with the Court's ruling on the § 1983 claim because deliberate indifference imposes a higher threshold than negligence.

recognizing and preventing inmate suicide "indicates a callous indifference to the health and safety of" inmates and violates corrections industry standards and practices; and (3) the staffing and supervision practices in the F-max unit created a serious risk to the health and safety of inmates, was directly related to Silcox's suicide, and violated the Florida Model Jail Standards and corrections industry standards and practices. (Doc. 47-1 ¶ 16(a)-(c)).

Federal Rule of Evidence 702 governs the admissibility of expert testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 requires judges to act as the gatekeeper to ensure that expert testimony "is not only relevant, but reliable." Daubert v. Merrell Dow Pharm., Inc, 509 U.S. 579, 589 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (holding that Daubert's gatekeeping obligation applies to all expert testimony). This requires that the testimony be "more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Whether such testimony is reliable "depends on the particular facts and

circumstances of the particular case." <u>Hughes v. Kia Motors Corp.</u>, 766 F.3d 1317, 1329 (11th Cir. 2014) (quotation marks omitted) (quoting <u>Kumho Tire Co.</u>, 526 U.S. at 158).

The party offering the expert testimony bears the burden of demonstrating admissibility by a preponderance of the evidence, and this burden is "substantial." <u>Cook</u>, 402 F.3d at 1107. To be admissible, the proponent of the testimony must satisfy three requirements:

> First, the expert must be qualified to testify competently regarding the matter he or she intends to address. Second, the methodology used must be reliable as determined by a <u>Daubert</u> inquiry. Third, the testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue.

<u>Arthur v. Comm'r, Ala. Dep't of Corr.</u>, 840 F.3d 1268, 1309 (11th Cir. 2016). If the testimony satisfies these three requirements, it must then still satisfy Rule 403. <u>United States v. Frazier</u>, 387 F.3d 1244, 1263 (11th Cir. 2004) (en banc).

1. <u>Eiser is qualified to testify competently</u>.

Eiser is qualified to render opinions concerning jail policies and procedures. Rule 702 allows a witness to qualify as an expert based upon his or her knowledge, skill, experience, training, or education. Fed. R. Evid. 702; <u>see</u> <u>Frazier</u>, 387 F.3d at 1260–61. Eiser has twenty-nine years of experience operating and administrating a large local corrections facility. (Doc. 47-1 at 2). He has published works in the area of jail administration, developed curricula

to certify corrections officers, supervisors, and jail administrators, and teaches criminal justice at the undergraduate university level. (Doc. 47-1 at 2). Eiser's training, experience, and education render him qualified to testify competently as an expert on whether Hunter's policies and procedures, and the execution of those policies and procedures in regards to Silcox, complied with applicable corrections industry standards and practices. See Frazier, 387 F.3d at 1260–61.

Although Hunter "does not dispute that Mr. Eiser appears to be at least minimally qualified to testify regarding the matters he intends to address[,]" (Doc. 39 at 6), Hunter also asserts that "Mr. Eiser does not have the training, background, or expertise to provide an opinion on mental health care, or to opine that Dr. Bachus was incorrect." (Doc. 39 at 13). However, Hunter takes Eiser's statement out of context. Eiser is not offering an opinion about a medical decision—which he would not be qualified to do—but rather is offering an opinion as to whether the jail had sufficient mental health protocols in place to protect inmates. (See Doc. 47-1 at 11). To the extent that Hunter objects to specific statements that he feels require medical expertise, he may raise such objections at trial.

2. Eiser's opinions are reliable.

For the second prong, Plaintiff must demonstrate that Eiser's opinions are reliable. Frazier, 387 F.3d at 1261. The reliability prong is distinct from an expert's qualifications; thus, an expert can be qualified but his opinions

unreliable. Id. "[A] basic foundation for admissibility [is] that '[p]roposed [expert] testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known.'" Id. (second and third alterations in original) (quoting Daubert, 509 U.S. at 590). The Supreme Court provided a non-exhaustive list of factors to guide district courts in assessing the reliability of expert opinions: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010) (citing Daubert, 509 U.S. at 593–94). Although more applicable to assessing the reliability of a scientific expert's opinions, these criteria "may be used to evaluate the reliability of non-scientific, experience-based testimony." Frazier, 387 F.3d at 1262 (citing Kumho Tire, 526 U.S. at 152). "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." Id.

An expert who relies upon his experience as the foundation for his opinions must explain how his experience supports his opinions. See Hughes, 766 F.3d at 1329 (citing Frazier, 387 F.3d at 1265). The proponent of the expert testimony has the burden to explain how the expert's experience "led to the

conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." <u>Frazier</u>, 387 F.3d at 1265.

The Rules do not "require[] a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 135, 146 (1997). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." <u>Cook</u>, 402 F.3d at 1111 (citing <u>Frazier</u>, 387 F.3d at 1267).

Although couched as an attack on the opinions' reliability, Hunter's challenges go to the weight of Eiser's opinions, not their admissibility. Eiser explains that his experience and education have made him familiar with several publications concerning jail standards and practices, (Doc. 47-1 at 2–3), and that he analyzed the facts of the case in accordance with those standards and what he knows from his education and substantial experience in formulating his opinions, (Doc. 47-1 at 5). Arguments about conflicting evidence that Eiser relied upon, whether the standards used are mandatory, or how the standards should apply to the jail, are all arguments attacking the weight of Eiser's opinions and can be made before the jury. <u>See</u> <u>Rosenfeld v. Oceania Cruises, Inc.</u>, 654 F.3d 1190, 1194 (11th Cir. 2011).

Notwithstanding the general admissibility of Eiser's opinions, one opinion in his report warrants further discussion. In his report, Eiser states:

> Based upon my training, education and experience as a jail administrator (and not as a medical expert) I found it shocking that the next day (after his admission) a Licensed Practical Nurse (LPN) Rex Nicola would ignore the diagnosis and risk assessment of a licensed doctor (Psychiatrist) and approve Mr. Silcox for general population housing.

(Doc. 39-1 at 13). However, there is nothing in the record that indicates Bachus ever recommended Silcox be placed in any specific housing level—let alone something other than general population. As stated previously, even if Bachus held a subjective belief that Silcox was a suicide risk, he failed to mention it to anyone in Hunter's office and his discharge notes are not explicit on this issue. (See Docs. 49-17 at 44; 40-4 at 1). It is unclear with what evidence Eiser formulated this opinion; unless Eiser can establish a factual basis for this opinion via a proffer, it will be excluded.

3. Eiser's opinions are helpful to the trier of fact.

To assist the trier of fact, expert testimony must concern matters beyond the knowledge of the average juror. Frazier, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. "While it is well established that a qualified expert in a civil case may offer his opinion on an 'ultimate issue' in a case, Fed. R. Evid. 704(a), experts 'may not testify to

30

the legal implications of conduct' or 'tell the jury what result to reach.'" Commodores Entm't Corp. v. McClary, 879 F.3d 1114, 1128 (11th Cir. 2018) (quoting Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990)). Because the court is the jury's only source of law, "questions of law are not subject to expert testimony. . . . Thus, the district court must take 'adequate steps to protect against the danger that [an] expert's opinion would be accepted as a legal conclusion.'" Id. (quoting United States v. Herring, 955 F.2d 703, 709 (11th Cir. 1992)).

Eiser cannot offer an opinion concluding that Hunter was deliberately indifferent or negligent in handling Silcox, see id.; however, he can offer opinions on whether Hunter's policies in the jail complied with common jail standards and practices. Although not conclusive on the matter, whether Hunter complied with industry standards can bear on the standard of care in determining negligence. See Sorrels v. NCL (Bahamas) Ltd., 796 F.3d 1275, 1282 (11th Cir. 2015). As the common jail industry standards and practices are unknown to the average juror, Eiser's opinions on those standards and practices may be helpful to the jury in determining whether Hunter was negligent. See id.

Because the Court has granted summary judgment on the civil rights claim, some of Eiser's opinions may no longer be pertinent. Also, it is likely that Eiser's opinions concerning Hunter's investigation after Silcox's suicide are

irrelevant to the actions taken to prevent the suicide; however, the Court will reserve ruling on the admissibility of such opinions until trial. If evidence comes to light at trial making such opinions relevant, the Court will hear argument from the parties at that time.

### D. Plaintiff's Motion For Partial Summary Judgment

Plaintiff has moved for partial summary judgment seeking to exclude twelve of Hunter's affirmative defenses. (Doc. 41 at 1). Plaintiff argues that the first, third, fifth, eighth, ninth, tenth, eleventh, and sixteenth affirmative defenses are merely denials of liability and thus improperly raised as affirmative defenses (hereinafter the "denial defenses"); that the second, seventh, and twelfth affirmative defenses fail on the merits as a matter of law; and that the fifteenth affirmative defense is both improperly raised and would fail even if properly raised. (Doc. 41 at 1–2). As for the denial defenses, Hunter claims that Plaintiff has moved for summary judgment on them, but has not argued that Hunter would be precluded from using them at trial and defers to the Court. (Doc. 48 at 1).

Partial summary judgment may be used to dispose of affirmative defenses. Int'l Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co., 944 F. Supp. 886, 891 (M.D. Fla. 1996).

1. <u>The denial defenses are not affirmative defenses</u>.

"A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense." <u>In re Rawson Food Serv., Inc.</u>, 846 F.2d 1343, 1349 (11th Cir. 1988). Plaintiff is correct, as Hunter implicitly concedes, that the denial defenses are not affirmative defenses. <u>See</u> <u>id.</u> Although Plaintiff seeks summary judgment on these "affirmative defenses" to narrow the issues for trial, Plaintiff is not asking the Court to determine these issues on the merits based on an absence of a genuine issue of material fact. Instead, the Court strikes the denial defenses as affirmative defenses; they are issues that Hunter may raise at trial if appropriate.

2. <u>The Second Affirmative Defense should be withdrawn</u>.

The parties agree that the Second Affirmative Defense should be withdrawn because Hunter is not able to prove medical negligence. Accordingly, this affirmative defense is deemed withdrawn.

3. <u>Summary judgment on the Seventh Affirmative Defense is granted</u>.

Hunter's Seventh Affirmative Defense states that any damages should be reduced by the pro rata share attributable to Silcox's own actions or omissions. (Doc. 35 at 6). Plaintiff correctly asserts that summary judgment in his favor is appropriate because Florida law does not allow the "apportion[ment] of fault as between a negligent actor and an intentional one." (Doc. 41 at 11). Hunter contests whether Silcox's actions were actually intentional, arguing that a

factual dispute exists whether Silcox intended to take his own life or if the suicide was an unintended consequence of his actions. (Doc. 48 at 3).

Under Florida law, fault may not be apportioned between negligent and intentional tortfeasors. <u>Wyke v. Polk Cty. Sch. Bd.</u>, 137 F.3d 1292, 1293 (11th Cir. 1998) (relying on <u>Merrill Crossings Assoc. v. McDonald</u>, 705 So. 2d 560 (Fla. 1997) and <u>Stellas v. Alamo Rent-A-Car</u>, 702 So. 2d 232 (Fla. 1997)). Although there is evidence that Silcox may have previously lied about or faked suicide attempts, there is no evidence that Silcox was only intending to fake suicide on this occasion. To the contrary, the FDLE report states that Silcox attempted to hang himself three times, making adjustments to the sheet after each of the first two attempts, and perishing on the third. (Doc. 40-7 at 2). Plaintiff's motion for partial summary judgment as to Hunter's Seventh Affirmative Defense is granted.

4. <u>Summary judgment on the Twelfth Affirmative Defense is granted</u>.

Hunter's twelfth affirmative defense is that Hunter is entitled to a set off for any of Plaintiff's expenses previously paid by Defendants. However, Hunter concedes that Plaintiff is entitled to summary judgment on this affirmative defense.

5. <u>Summary judgment on the Fifteenth Affirmative Defense is granted</u>.

In accordance with the discussion on the Seventh Affirmative Defense, Hunter cannot apportion liability. Therefore, summary judgment on this affirmative defense is granted.

**IV. CONCLUSION**

Accordingly, it is hereby

**ORDERED:**

1. Hunter's Amended Motion for Summary Judgment (Doc. 46) is **GRANTED as to Count I**, the civil rights count, but **DENIED as to Count II**, the negligence count. The Clerk shall delay entering judgment on Count I until the conclusion of the case.

2. Hunter's <u>Daubert</u> Motion to exclude Plaintiff's expert, (Doc. 39), is **DENIED**.

3. Plaintiff's Motion for Partial Summary Judgment, (Doc. 41), is **GRANTED IN PART**.

a. Hunter's first, third, fifth, eighth, ninth, tenth, eleventh, and sixteenth affirmative defenses are **STRICKEN**.

b. Hunter's second affirmative defense is **WITHDRAWN**.

c. Summary judgment on the seventh, twelfth, and fifteenth affirmative defenses is **GRANTED**.

4. Not later than **August 20, 2018**, the parties shall file a joint notice stating the trial term they are requesting. The Court will do its best to accommodate the parties' request. By that same date, the parties should also notify the Court whether a settlement conference with the magistrate judge would be helpful.

**DONE AND ORDERED** in Jacksonville, Florida this 31st day of July, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

jb
Copies to:

Counsel of record